Good morning, Your Honors. My name is Robert Racine, R-A-C-I-N-E, and I'm appearing on behalf of Dr. Diane Girardo, who's also present in the courtroom today. Academic discrimination at USC is maintained because it's systemic, it's systematic, and it's secret. The reason they can continue to discriminate against professors such as my client is because how the EXCOMM committee, in this case, held their meetings, composed their rankings, was kept secret from Dr. Girardo. The court below erred by considering her deposition testimony where she testified that she did not have personal knowledge of how and why and what was the basis of the committee's rankings. One of the rationales Judge Minnelli used is that you can't show causation with respect to your retaliation claim. That she was getting lackluster raises beforehand and she makes her charge and is getting lackluster raises afterwards and therefore you can't show that her protected activity caused her lackluster raises. That's her rationale, right? Assuming her rationale to be correct, that is making a decision of a material highly disputed fact. What facts in what I've just posited are disputed? She got poor raises before. If you look at the declaration and the separate statement of undisputed facts, Dr. Girardo contests that. Well, she got good raises before? If you look at Dr. Ward's, I can get you his... No, no, no, I'm asking, didn't she always get bad raises? No, she did not, Your Honor. The raises are based... The reason why the court erred insofar as the equal pay and in the retaliation claim is she's saying, well, we have to look at wages as a component. Dr. Girardo has tenure. This is an unusual case. She's saying that because of her outspoken opinions with how USC deals with women in general and with the student population, she was retaliated against by the only method possible that they could use against her. They couldn't defraud her. We're talking past each other. Wasn't she rated low prior to her protected activity? We dispute the ratings because there was no... No, no, you're saying that she wasn't rated fairly. I understand that. But it's true that she was rated low prior to her protected activity. Isn't that true? No, Your Honor. She got high ratings? She was the top performer in the department? There's no evidence to support that one way or another because all of that evidence, according to Dr. Timmy's deposition testimony, was destroyed. He comes up with this conclusion based upon numbers. These numbers are meaningless. They don't have any meaning unless you put them in context. In context of this particular case, if she... First of all, we look at the full professors who are male and female. There's only her. So if you look at it from a point of statistical disparity as set forth by our two experts, then the discrimination is systemic, and then the causation flows from that. Once she complained in 1997 against Timmy, he zeroed her out. So I was on the right track. Back in 1997, she was getting low ratings from the dean? From Dean Timmy. Dean Timmy is the bad guy. Okay, and then Judge Minnelli said she was getting low ratings from the dean before she filed her EEOC charge. That is incorrect. She just told me that she got zeroed out by Dean Timmy in 1997. In 1997, but she complained in 1997 about discrimination. The ratings, the intent follows, the discriminatory intent in this case follows the bullet. Let me ask you another question. You submitted a declaration of somebody named Daniel Knapp. Does that ring a bell? I did not. You didn't? I thought you submitted a declaration of a guy named Daniel Knapp, who would have said that Dean Timmy reacted badly when he found out about the EEOC charge. That doesn't ring a bell? It's in the record below. I was not the attorney who handled the motion for summary judgment, but I do believe that that's part of the record below. That is correct. So the plaintiff did submit a declaration of Daniel Knapp? I believe that to be true. There's no reference to it in the blue brief, your opening brief. Is there some reason for that? It was just an error of omission, Your Honor. If that is a pertinent fact, I think that the facts contained in the excerpts of record that we filed and in the opening brief are sufficiently warrant a reversal because – Not in the excerpts of record? I didn't include it in the excerpts of record. I apologize for that. Or it's not mentioned in the brief either. I'm just wondering if there's some reason for that. There is no reason other than the fact that I've tried to hone in on the – even though this is a de novo review, I tried to hone in on the stated reasons that the court below made in dismissing her three – in essence her three claims for discrimination, Equal Pay Act, and retaliation. But to answer your question about the causation issue, the causation issue can be derived from the fact that Dean Timmy, after she complained, and there's evidence of – the counsel likes to call them stray remarks, but there are comments made that demean women, that demean students, that Dr. Gerardo brought to the attention of the human resources or the EEO officer and to Dean Timmy himself. So what he did, his only remedy was he was the ultimate approver of these illusory ratings. If you look at the charts, they mean nothing in context. They're just numbers. How were they arrived at? Who prepared them? Where were the student evaluations? Dr. Gerardo received the Fulbright Award and the Guggenheim Scholarship. These are two incredibly prestigious awards. Is it also true that she wouldn't provide that kind of information to the provost because she was mad at the university? No, Your Honor. That's not true at all. That's a disputed question. In fact, Dean Timmy claims that. She was ordered to do so. There's e-mails in the record that basically says, until my grievance is resolved, I prefer to do things in writing. I'm not talking about that. Isn't there an e-mail from Dr. Gerardo saying, I'm not going to provide my achievements to the university because I'm angry over how I've been treated with salary? There is reference to that in the record, yes, Your Honor. Isn't that a good reason why she might not have gotten a raise? No, Your Honor. No? If you look at the criteria that they use for teaching service and research, I attach that in the records. If you look at that criteria, there is nothing in there about collegiality, being nice to the dean. In the Stiegel case, those are what I would call hot terms. They're discriminatory. If a woman is assertive, she's uncollegial. If she didn't go to the retreats because she didn't want to participate in drinking and those things, to be in the boys club, that's uncooperative. If you look at research, her research is impeccable. Her service is impeccable. Her teaching is impeccable. They come up with this scenario of we're going to assign little numbers, and we use Mike Ward to do that to, in essence, perpetuate discrimination against people who oppose or reasonably believe that there's discrimination going on at USC. The record's clear that Dr. Gerardo did that continually. If you look at the minutes, she says we're underrepresented here. This is in 97 when Dean Timmy comes on board. So the only thing he could do is he kept her off committees. He reassigned her. He canceled one of her French classes. He took away her authority to even write the syllabi for the classes that she's supposed to teach. And if you look at the Bryson case that we cited, once you have tenure, prestige, honor, those types being on select committees, she wasn't allowed to sit on the EXCOMM committee that does these supposedly secret ratings. Do you want to reserve some time for rebuttal, or do you want to use it all? I think I should reserve some of your time. Okay. Thank you, Mr. C. Good morning. Good morning, Your Honors. I'm Al Latham, representing the University of Southern California. Let me begin by answering Judge Silverman's question, if I may. Move the mic up a little bit and get behind it, okay? Thank you. Let me begin by answering Judge Silverman's question. Yes, she got continuously poor ratings, both by the executive committee, which is elected by the faculty for peer review purposes in a secret ballot election, and from Dean Timmey. She contends that the discrimination started in 1996 when Dean Timmey became the dean. In fact, it's undisputed. If you look at the Regnier Declaration, which is supplemental excerpts of Record 56, supplemental excerpts of Record 56, it's undisputed that she got poor ratings before Dean Timmey became dean. In any event, she was, as Judge Minella pointed out, consistently rated by her faculty peers as last or next to last. Now, isn't it true that Dean Timmey would move her even lower than what the EXCOMM committee rated her? Dean Timmey sometimes made slight adjustments, but the evidence of their own expert is that, but for Girardo, there is no evidence that Dean Timmey moved women lower. Indeed, their own expert... He just moved her lower. He moved her lower in some instances, and there are reasons for that that are undisputed. Well, how could they be disputed when most of the activity of the committee is not disclosed? Those records were apparently destroyed. The individual ratings, except for one year, were, according to the usual process, discarded. That's in order to maintain the anonymity of the process. That had been the process all along. There was never any issue... I'm not quarreling with that, but I am saying that it seems to me that at least there's some indication that she was not treated correctly after Dean Timmey came because he lowered her ratings and she was the only woman. The reasons why he lowered the ratings, and by the way, it was not a material lowering. The year after, by the way, let me say this. The year after the EEOC charge was filed, it is undisputed he did not touch the rating of the executive committee. He left it unchanged the very year after the EEOC charge was filed. However, it is undisputed that he was displeased with her behavior in several respects. First of all, she did indeed, it is in the record, that she said in writing, it can't be disputed, it's in a memo from her, I will not submit the information that the provost requested because I don't believe the school deserves credit for what I do. That's in writing, it's in the record. She wrote Dean Timmey, who, by the way, I'm sorry to say died last month. She wrote Dean Timmey and told Dean Timmey in writing, I will not meet with you. And when Dean Timmey asked her to come in for an annual evaluation, she wrote him again and said, in essence, didn't you hear me? Nothing has changed. Nothing has changed is a quote. I won't meet with you. She refused to attend the annual retreats, which Dean Timmey thought important. Why did she not attend the annual faculty retreats? She says they weren't important. She says there was no agenda, there were no publications that came out of it, and therefore, in Dr. Gerardo's view, they were not important. And very important is the year that she was zeroed out. Allusion was made to Dr. Gerardo having made a complaint in 1997 before her EEOC complaint in the year 2000. That complaint, which alleged both sex discrimination and denial of academic freedom, was that she was zeroed out for an incident of her threatening a female faculty member with the disclosure of private embarrassing facts, namely that female faculty member's alcoholism. If the female faculty member refused to levy a false charge of sex harassment against a tenure candidate, she grieved the denial of that raise. And this is all in the record. She grieved the denial of that raise. A faculty panel of two female professors and one male professor from outside of the School of Architecture heard that grievance and concluded that zeroing her out was perfectly appropriate because of her highly questionable conduct. And let me say something. That conduct is undisputed, is it? That conduct, that was the finding of the faculty panel, which Judge Minella said is determinative of that particular issue. And I agree that it's determinative of that particular issue under California law. In any event, the fact that it shows that it was not pretextual that Dean Timmy zeroed her out because a faculty committee that admittedly was unbiased, she was asked, do you have any reason to believe they were biased? She said no. Made these findings a fact. One of the problems with the findings of their expert, one of the many problems that Judge Minella pointed out was that he included the zeroing out here, which was perfectly justified by the findings of the faculty committee. I want to point out also this notion of stereotyping. The circuit rightly has concluded that stereotyping on the basis of sex can be a form of sex discrimination. However, the essence of it is where something is accepted, indeed maybe even approved if done by a male, and is disapproved if done by a female, hence the word aggression. The fact of the matter is that there is zero evidence in this record that the things Dean Timmy complained of about her were done by any males or anything similar was done by any males. Where is the evidence that a male could say, I won't meet with my dean and get away with it? Where is the evidence that a male could say, I won't submit what the provost asked for and get away with it? Or refuse consistently to attend faculty retreats? Or worst of all, as found by an admittedly unbiased faculty panel, threaten another faculty member? Are you saying then that, I'm trying to figure this out, are you saying of course she was guilty of misconduct? Yes. Aggressive misconduct which would apply to a male or anybody else, or female in the family, that is why the dean rated her lower when it came to the races? Absolutely. The dean so testified, and it's in the record, that he cited these things. And the things he cited, number one, are undisputed. Well, wait a minute. Let me get this. Certainly. Because she was an aggressive person, did wrong things, she gets less pay. And, you know, that trenches a little bit on a male attitude that women should do just what the men in the faculty do and not fight for other women. Judge Bright, with all respect, that's not at all sex stereotyping because there's not a scintilla of evidence that that kind of, quote, aggressive conduct, and it's worse than aggressive, it's misconduct, was tolerated on the part of any males. And in talking about, you know, what kind of conduct Dr. Gerardo engaged in, let me cite the testimony of Lee Buckley, who is the woman who was the victim of that incident when Dr. Gerardo was zeroed out. She testified, Diane then proceeded to get quite aggressive in terms of forcing me or wanting to force me to say a lie about Professor Steele. That's SER 62. And then Ms. Buckley went on, but she did not let go. She was like a pit bull. SER 62 at page 26. This is not a stereotype where a male who's aggressive is great and a female needs to be demure. This is misconduct so found by an admittedly unbiased panel consisting of two women and one man. And the use of the word aggressive, in this case, by a woman who is a victim of that aggression is hardly stereotyping. I want to make one other point, very important. The so-called stray remarks. It's very important to recognize that Judge Minnell dealt with each and every stray remark that was raised before her at the district court level. The other stray remarks that have been raised only on appeal were not addressed by Judge Minnell because they were not raised below. And if you look at those remarks, you know, remarks allegedly to a student, for example, that is allegedly sexist by not Timmy, but by one, only one member of the executive committee, you will find that those are buried in complaint letters that Professor Girardo wrote and that are hearsay, a student told me this or a student told me that or another professor told me this. Judge Minnell was not given the opportunity to address any of those and they should not factor into this court's decision. I have one other question I really like your thought on. One of the reasons that the university gave for her not being paid on the same rate as others, I guess, I'm not saying there's an equal pay issue here because she was not, she has a different capacity, but she was a member of the faculty, very highly rated and they said, well, we didn't give that to her because she's not a licensed architect. Well, first of all, you would need to compare total salary to total salary, one of Judge Minnell's points, and that wasn't done by plaintiff on an equal pay act basis. But in comparing total salary to total salary, it is perfectly okay to take account of market factors and your honor has so ruled, I believe, in some 8th Circuit equal pay cases. Here in the 9th Circuit, one of the leading cases on that very point is the first of two, Stanley versus University of Southern California cases, 13, F3rd, 13, 13. Otherwise, a French full professor should be paid the same as a neurosurgery full professor? No, of course not. You can take account of the market. Thank you, Your Honor. Thank you. Mr. Racine, you have about a minute and change left. I'll be very, very quick, Your Honor. To address the architectural issue that the Judge Minnell relied on, again, that's a question of fact. That issue should be taken into consideration for the salary, initial salary. It should not be taken into consideration. And it's a post hoc rationalization submitted by USC to respond to the EEOC charge that that's the difference that she didn't get her merit increases. If you look at Exhibits L attached to the declaration and N, Dr. Gerardo's meeting of the faculty minutes, you can see that she's outspoken. And she's outspoken on feminist issues. So we use the term aggression. So let me focus on the argument about the grievance hearing. The grievance hearing took almost three years, Your Honor. When this testimony that counsel just read to you, it's in page 17 of my brief. It was in February of 01 or April of 01. If even assuming that should be true, how could that be taken into consideration for her lower raises for 96, 97, 98, and 99 in the year 2000? It's an argument. It's a factual argument. It's a material argument that a trial fact should hear, not the trial court. And if you look at their own expert on their Exhibit 60 at SCR 26, it's the last page of Dr. Ward's analysis based on the fact, if you just look about her projected salary from 97 to 2004 and what she lost just in her projected salary. She started at a lower salary than the architects. She got a much lower salary. Please wrap it up because you're out of time. Okay. Then the last incident, their response to the EEOC charge that he didn't give her a higher rating, the inference that I draw from that is that shows a consciousness of guilt on behalf of Dean Timmy. Thank you, Your Honor. Thank you. Thank you, Mr. Latham. The case just started. It is submitted.
judges: Bright , B. Fletcher, Silverman